## BRIMSTONE R. & CANAL CO. v. UNITED STATES et al.

(District Court, W. D. Louisiana, Lake Charles Division. May 22, 1926.)

No. 241.

Commerce ⊜88—Previous general order of Interstate Commerce Commission held not to have established joint rates in specific case as condition precedent to authority to make an order changing division of such rates retroactive (Interstate Commerce Act, §§ 1[4], 15[3] [6], as amended by Transportation Act 1920, §§ 400, 418 [Comp. St. Ann. Supp. 1923, §§ 8563, 8583]).

Ruling of the Interstate Commerce Commission, made on application of carriers for general increase of freight rates, and authorizing a flat increase, did not have the effect of establishing any specific joint through rate, as to which there was no hearing, as required by Interstate Commerce Act, § 15(3), as amended by Transportation Act 1920, § 418 (Comp. St. Ann. Supp. 1923, § 8583), so as to give the commission authority to make a subsequent order, changing division of joint rates in a particular case, retroactive under section 15(6), as amended, in view of section 1(4) as amended by Transportation Act 1920, § 400 (Comp. St. Ann. Supp. 1923, § 8563).

Walker, Circuit Judge, dissenting.

In Equity. Suit by the Brimstone Railroad & Canal Company against the United States and others. On application for preliminary injunction. Granted.

James T. Kilbreth, of New York City, W. M. Barrow, of Baton Rouge, La., and C. R. Liskow, of Lake Charles, La., for complainant.

Daniel W. Knowlton and E. M. Reidy, both of Washington, D. C., for respondents.

Before WALKER, Circuit Judge, and BURNS and DAWKINS, District Judges.

DAWKINS, District Judge. Complainant seeks a preliminary injunction against an order of the Interstate Commerce Com-

mission fixing the division of joint through rates between the complainant and the defendant railroads, the contention being said order is illegal and unconstitutional for the reasons following, to wit:

"(1) That before rendering its said order, and the report and opinion preceding it, the Commission did not investigate or determine the reasonableness or justness of the divisions, or whether they would be unjust, unreasonable, inequitable, or unduly preferential or prejudicial as between the carriers parties thereto and participating therein, and that the Commission did not give consideration to any fact or circumstances which would entitle one of such carriers to a greater or less proportion than another carrier, or a joint rate, fare, or charge, as is required by paragraph (6), section 15, of the Interstate Commerce Act.

"(2) That the Interstate Commerce Commission was and is without jurisdiction, power, or authority to determine or prescribe the divisions to be received by the Brimstone Railroad out of the joint rates, fares, or charges received by the several carriers, except as between the carriers parties thereto, and except after a hearing and investigation of the operating expenses, taxes, and other facts and circumstances connected with the operation of each of the carriers participating in such joint rate, fare, or charge, as specifically set forth in paragraph (6) of section 15 of the Interstate Commerce Act.

"(3) That the Interstate Commerce Commission was and is without power, jurisdiction, or authority to establish any divisions of joint rates under section 15, paragraph (6), of the Interstate Commerce Act, except after it has established joint through rates and charges for the transportation of property, as provided in section 15, and particularly paragraph (3) thereof, of the Interstate Commerce Act.

"And, should it be held that the Interstate Commerce Commission did have jurisdiction, power, and authority to determine and prescribe the divisions to be received by the Brimstone Railroad, without complying with the provisions of paragraphs (1), (3), and (6) of section 15 of the Interstate Commerce Act, which complainant always denies, then, in the alternative, complainant alleges that the said orders and findings of the Commission in controversy are and will be illegal, null, and void, and result in the taking of the Brimstone's property without due process of law, in violation of the Fifth Amendment to the Constitution of the United States, because:

"(1) The said orders, and particularly the report, opinion, and order of December 14, 1925, attempt to determine divisions to be received by the Brimstone from its connecting carriers prior to December 14, 1925, and subsequent to August 1, 1921, thereby prescribing divisions to be applied retroactively.

"(2) That the Interstate Commerce Commission was and is without jurisdiction, power, or authority to so prescribe and determine divisions to be applied retroactively, for the reason that the joint rates, fares, and charges, of which the divisions received by the Brimstone Railroad form a part, were not established pursuant to a finding or order of the Commission, as is provided for by paragraphs (1), (3), and (6) of section 15 of the Interstate Commerce Act.

"Should it be held that the Interstate Commerce Commission did have jurisdiction, power, and authority to determine the divisions received or to be received by the Brimstone Railroad, as set forth in the last two preceding statements, then, and further in the alternative, the complainant alleges that the orders in controversy, and particularly the order of December 14, 1925, are and will be illegal, null, and void, and result in the impairment of the obligation of a contract, and in the taking of the Brimstone's property without due process of law, in violation of the Fifth Amendment to the Constitution of the United States, and should be set aside, for the following reasons:

"(1) That the divisions which have been and will be received by the Brimstone were and are established by agreement by and between the Brimstone Railroad and the other carriers parties thereto, and were not established pursuant to a finding or order of the Interstate Commerce Commission.

"(2) The Interstate Commerce Commission is without jurisdiction, power, or authority to so prescribe and determine divisions to be applied retroactively when such divisions are and have been agreed upon between the interested carriers and established by a contract between the parties thereto.

"(3) In the event the court should hold that section 15, paragraph (6), of the Interstate Commerce Act is retroactive, and authorizes the Commission to make divisions of through rates prescribed by it retroactive in the cases heretofore mentioned, then it is alleged that section 15, paragraph (6), of the Interstate Commerce Act is itself unconstitutional, null, and void, in that it impairs and annuls the obligation of the contracts made and entered into by and between the Brimstone Railroad, complainant, and the Louisi-

ana Western Railroad Company, and by and between the Brimstone Railroad and the Kansas City Southern Railway Company, under and by virtue of which contracts the divisions received by the Brimstone Railroad prior to the adoption of the order of December 14, 1925, were paid, denies to the Brimstone Railroad the equal protection of the law, and takes its property without due process of law, in violation of the Fifth Amendment to the Constitution of the United States.

"By amendment to the bill, the orders are further contested on the ground that the findings and orders of the Commission were made and issued without the introduction or consideration of any evidence to show the reasonableness or unreasonableness, or justness or unjustness, of the divisions of the joint rates as between the carriers parties thereto, and that the said finding and orders were made and issued without the introduction or consideration of any evidence to show the reasonableness or justness, or unreasonableness or unjustness, of the divisions of any particular rate, nor was any evidence introduced or considered showing the amount of service performed by the Brimstone and its several connections under all or any individual joint rate or rates, as is required by the Interstate Commerce Act.

"The orders are further contested by amendment to the bill, on the ground that over fifty (50) per cent. of the entire traffic of the Brimstone Railroad moved and moves on *proportional rates*, and that as to such rates the Commission is without power and authority, to establish and make retroactive divisions.

"(4) Should it be held that the Interstate Commerce Commission did have jurisdiction, power, and authority to determine and prescribe the divisions to be received by the Brimstone Railroad retroactively, and should it be held that Congress did have and exercise the power to annul the said contracts without violating complainant's vested rights, then, in that event, and further in the alternative, the complainant alleges that the orders in controversy are and will be illegal, arbitrary, unreasonable, unjust, null, and void, and confiscatory, and will result in the taking of the Brimstone Railroad's property without due process of law, in violation of the Fifth Amendment to the Constitution of the United States, for the following reasons:

"(1) That the revenue which would have been received by the Brimstone Railroad & Canal Company under the divisions prescribed by the Commission from its connections, the Louisiana Western Railroad and the Kansas City Southern Railway, would have been and is less than the reasonable, just, and proper operating expenses of the Brimstone Railroad during the period from August 1, 1921, to December 31, 1925, inclusive.

"The order is further attacked as being beyond the power and authority of the Commission to make, because the Commission has eliminated certain items of expense, actually incurred and paid by the Brimstone Railroad during the period from August 1, 1921, to December 31, 1925, as necessary in its operations as a common carrier, which items are set forth in detail and specifically in various paragraphs of the bill of complaint, and will be pointed out specifically in the argument."

Without going into other matters, we think the preliminary writ should be granted for these reasons: The order is made to operate from the date of initiating the proceedings (which were begun by the Commission upon its own motion)—in other words, is given a retroactive effect of more than four years under conditions which we do not believe, in view of provisions of the statute defining the Commission's powers, is permissible. The pertinent sections of the Interstate Commerce Act, as amended by the Transportation Act of 1920, are as follows:

"Sec. 1 (4). It shall be the duty of every common carrier subject to this act engaged in the transportation of passengers or property to provide and furnish such transportation upon reasonable request therefor, and to establish through routes and just and reasonable rates, fares, and charges applicable thereto, and to provide reasonable facilities for operating through routes and to make reasonable rules and regulations with respect to the operation of through routes, and providing for reasonable compensation to those entitled thereto; and in case of joint rates, fares, or charges, to establish just, reasonable, and equitable divisions thereof as between the carriers subject to this act participating therein which shall not unduly prefer or prejudice any of such participating carriers." Comp. St. Ann. Supp. 1923, § 8563.

"Sec. 15 (6). Whenever, after full hearing upon complaint or upon its own initiative, the Commission is of opinion that the divisions of joint rates, fares, or charges, applicable to the transportation of passengers or property, are or will be unjust, unreasonable, inequitable, or unduly preferential or prejudicial as between the carriers parties

thereto (whether agreed upon by such carriers, or any of them, or otherwise established), the Commission shall by order prescribe the just, reasonable, and equitable divisions thereof to be received by the several carriers, *and in cases where the joint rate, fare, or charge was established 'pursuant to a finding or order of the Commission* and the divisions thereof are found by it to have been unjust, unreasonable, or inequitable, or unduly preferential or prejudicial, the Commission may also by order determine what (for the period subsequent to the filing of the complaint or petition or the making of the order of investigation) would have been the just, reasonable, and equitable divisions thereof to be received by the several carriers, and require adjustment to be made in accordance therewith. In so prescribing and determining the divisions of joint rates, fares and charges, the Commission shall give due consideration, among other things, to the efficiency with which the carriers concerned are operated, the amount of revenue required to pay their respective operating expenses, taxes, and a fair return on their railway property held for and used in the service of transportation, and the importance to the public of the transportation services of such carriers; and also whether any particular participating carrier is an originating, intermediate, or delivering line, and any other fact or circumstance which would ordinarily, without regard to the mileage haul, entitle one carrier to a greater or less proportion than another carrier of the joint rate, fare or charge." Comp. St. Ann. Supp. 1923, § 8583.

(Underscoring by the writer of this memorandum.)

It is not pretended that the Commission has ever specifically considered or fixed the through joint rates, the division of which it attempts to make as between the complainant and the defendants. But it is contended that this was done by the ruling generally referred to as Ex parte 74, 58 Interst Com. Com'n R. 220 et seq., in the matter of the application of carriers in Official, Southern, and Western Classification territories for authority to increase rates. As is generally known, that was a proceeding in which the railroads of the country filed with the Commission, during the latter part of April and early part of May, 1920, applications for a general increase of freight revenues to a basis that would enable them to earn an income "equal, as nearly as may be, to 6 per cent. upon the aggregate value of the railway property of such carriers held for and used

in the service of transportation." The matter was considered in its broad and general aspects, first as to the country as a whole, and secondly with reference to a definite grouping of the railroad systems of the United States, which were designated in the authority to increase rates as the Eastern, Southern, and Western groups, respectively. The Commission heard such evidence as it thought proper as to the sufficiency of those rates as applicable to each group, and accordingly allowed the increases on separate percentage bases. It did not, and of course could not, in that general investigation, consider as such any individual rates or classifications, but merely authorized flat increases in the manner indicated. In the course of its report the Commission, under the heading "Conclusion as to General Increase," at page 246, I. C. C. Reports, said:

"We are of opinion and find that the following percentage increases in the charges for freight service, including switching and special services, together with the other increases hereinbefore approved, would under present conditions result in rates not unreasonable in the aggregate under section 1 of the act, and would enable the carriers in the respective groups, under honest, efficient, and economical management and reasonable expenditures for maintenance of way, structures, and equipment, to earn an aggregate annual railway operating income equal, as nearly as may be, to a return of $5\frac{1}{2}$ per cent. upon the aggregate value, for the purposes of this proceeding, of the railway property of such carriers held for and used in the service of transportation and one-half of 1 per cent. in addition: Eastern group, 40 per cent.; Southern group, 25 per cent.; Western group, 35 per cent.; Mountain-Pacific group, 25 per cent."

It then made rules for the application of these percentages as between the respective groups. At page 247 it was further said:

"Considerable evidence was presented with respect to the rates upon a number of individual commodities, including coal, lumber, cement, fruits and vegetables, petroleum, brick, sand, gravel, and rock, asphalt, slag, grain, live stock, packing house products, ore, bullion, potash, salt, fertilizers, and terra cotta.

"Various issues have been raised or are presented as to these commodities, the principal of which are as follows: (a) Whether there should be departures from the general percentage increases by maintaining differentials or by the application of specific increases instead of percentages; (b) whether

maximum increases should be provided in order to avoid the full percentage increase upon relatively high rates from distant points of production to important markets; (c) whether, because of the high cost of production and marketing of some commodities, the percentage increases proposed by carriers will result in a cost delivered at points of market or consumption so great as to curtail production and distribution, an undesirable situation at this time of world shortage of commodities; (d) whether a more general necessary use warrants a lower transportation charge; (e) whether the rates effective June 24, 1918, before General Order No. 28 became effective, should be made the basis of readjustment now by applying thereto a 25 per cent. increase and superimposing thereon the percentage increases now found reasonable. *Our general conclusions as to the impracticability of specific increases or of attempting now to maintain differentials dispose of a number of these contentions. It should also be said that, while we do not here sanction specific increases in lieu of percentages, we are not to be understood as expressing disapproval of increases of that character made by the Director General. Such increases were made under war conditions and under circumstances that do not now exist.*

"Our attention was called at the hearing to a number of formal complaints now pending, and we are asked to except from the general increase the rates in issue in those complaints. This would have the effect, during the pendency of those proceedings, of giving the rates in question a preferred standing and of exempting them from the general increase. *In our opinion, a fairer disposition will be attained by applying the general increase to these rates, with the understanding that this action is without prejudice to any future findings.*"

(Underscoring by the writer.)

It next took up specifically some of the contentions with respect to the commodities mentioned by it above, and in each instance declined to itself fix or adjust such rates, except as to the percentage of increase, and in many instances left the matters to be adjusted by the carriers, and in others directed the application of the straight percentage increase, as will be demonstrated by the following:

With respect to coal the Commission said:

"*Coal.*—Carriers serving the Pennsylvania-Ohio-West Virginia coal fields propose to continue the existing differentials in coal rates, and have worked out a scheme of rates to effect that result. Carriers in the Southern and Western groups propose to ignore existing differentials in coal rates within those groups. The proposal of the Eastern lines to preserve existing relationships is approved, and carriers in the other groups should work out a similar plan for restoring the relative adjustments of coal rates now obtaining in those groups. An effort should be made promptly to devise rates in each group that will yield, as nearly as practicable, the same revenue in the aggregate as would be afforded by a straight percentage increase on the bases herein approved." Id. p. 248.

With reference to lumber, the conditions peculiar to that commodity were mentioned and it was said:

"For the purposes of this report it is our opinion that the percentages hereinbefore approved should apply to this commodity." Id. p. 249.

The conclusions with regard to petroleum were:

"It is concluded that no exception to the general percentage increases herein approved need at this time be made upon petroleum or its products. As has been observed in connection with other situations, the carriers should give careful consideration to the effect of the percentage increases approved on petroleum, and, if necessity arises, should arrange for such modifications as the situation may seem to warrant." Id. p. 249.

In dealing with sand, gravel, etc., the conclusion announced was:

"We are not convinced that exceptions should be made at this time from the percentages approved for traffic generally. However, the record does suggest that rates in eastern territory are out of proportion to those in the other groups. The carriers have indicated a willingness promptly to readjust rates in cases where hardship results from the general percentage increases, and their special attention is called to these commodities to the end that such action may be taken as the facts may seem to warrant." Id. pp. 250, 251.

Again, as to grain and grain products, the Commission directed as follows:

"Carriers and shippers unite in recommending that this equalization be continued because of the keenly competitive situation of the various markets and of the lines of railway serving such markets. However, sufficient detailed information to cover fully

the situation is not before us upon this record. We find that the grain rates into and out of these markets may be increased by the general percentages herein approved, with the understanding that the carriers will, within 30 days after the service of this report, file tariffs restoring the equalization through the grain markets now enjoying that basis. This should be done after conference with interested shippers, and, if desired, we will lend our co-operation in the premises." Id. p. 253.

And finally, in dealing with conditions such as the one in this case, it was said:

"In many cases divisions between carriers are in the form of specific amounts per unit. It is obvious that, unless divisions of this character be increased, such lines will receive no benefit from the increases herein approved, while the other carriers will receive more than the respective percentage increases applicable to the traffic. It is concluded that, where carriers earn specific amounts as their compensation out of through rates or fares, such amounts should be increased in the same percentages as the through rates or fares. Where the divisions of carriers participating in through rates or fares are in fixed amounts per unit and are absorbed by other carriers, such absorptions should be increased in the same percentage as the through rates or fares." Id. p. 254.

All of which demonstrates what the Commission was attempting to do was to allow such increases in freight rates as would meet the urgent and immediate needs of the carriers, without regard to the reasonableness or unreasonableness of any through or joint rates, and it clearly declined in each instance to fix or approve any specific rates.

Can it be said, in view of these circumstances, that the action of the Commission meets the condition precedent imposed by Congress for making its rulings retroactive to the date of initiating the investigation "in cases where the joint rate, fare or charge was established pursuant to a finding or order by the Commission * * *"? There has never been, so far as the record in this case discloses, any joint rate "established" by the Commission. As above pointed out, all that was done in Ex parte 74 was to authorize the railroad companies of the country to increase their rates within the maximums fixed for each group.

What has been said with regard to the increasing of rates in 1920 is equally applicable to the action of the Commission in the matter of reduced rates in 1922. It must not be forgotten that the power to make

rates or to adjust the divisions thereof is a legislative function, and where the Commission is permitted to make its rulings and orders, having the effect of legislation, retroactive, the existence of the conditions required by the statute must be beyond question. The general rule is that such provisions, as well as judgments, take effect from their enactment or rendition, and power such as that sought to be exercised in this case is a rare exception under modern government. Union Pacific Ry. Co. v. Stockyards Co., 231 U. S. 190, 34 S. Ct. 101, 58 L. Ed. 179, and authorities therein cited; 25 R. C. L., 1010, § 250.

The Commission itself, in effect, held in two cases that general orders granting to the railroads permission to increase their rates upon a percentage basis did not amount to an approval of existing rates. In Globe Soap Co. v. A. & S. Ry. Co., 40 Interst Com. Com'n R. 121, it used this language:

"The permission given in the Five Per Cent. Case, supra, was necessarily general. That case did not approve any specific rate as reasonable in itself or as properly adjusted with respect to other rates, nor did it justify in advance any rate which might be published as a result thereof. The act casts upon the carrier the burden of proof to show that a rate increased after January 1, 1910, is just and reasonable and that burden is not removed by a general permission of the Commission, such as that relied upon by the defendants, for it is the total rate which must be justified and not the amount of the increase. Under the law the burden in this case was upon the defendants to show that the rates complained of were just and reasonable. They have failed to sustain that burden." Id.

And again, in Steel & Tube Co. v. Director General, 61 Interst. Com. Com'n R. 526, it was said:

"We need not discuss further this phase of the controversy, for, regardless of any interpretation which may be placed upon that order, our sanction of a general adjustment does not carry with it the approval of any particular rate. Globe Soap Co. v. A. & S. Ry. Co., 40 Interst Com. Com'n R. 121."

And finally the statute itself, in paragraph 3 of section 15 (Comp. St. Ann. Supp. 1923, § 8583), provides the manner in which joint rates or charges, such as those involved in this case, may be fixed by the Commission. It reads:

"3. The Commission may, and it shall whenever deemed by it to be necessary or desirable in the public interest, *after full hear-*

*ing* upon complaint or upon its own initiative without a complaint, establish through routes, joint classifications, and joint rates, fares, or charges, applicable to the transportation of passengers or property, or the maxima or minima, or maxima and minima, to be charged (or, in the\ case of a through route where one of the carriers is a water line, the maximum rates, fares, and charges applicable thereto), and the divisions of such rates, fares, or charges as hereinafter provided, and the terms and conditions under which such through routes shall be operated; and this provision, except as herein otherwise provided, shall apply when one of the carriers is a water line," etc. (Underscoring by writer of this opinion.)

What is meant by a full hearing? It would seem clear that Congress intended that there should be a full hearing of the facts and consideration of the conditions upon which particular joint rates or charges were to be established. As above stated, this had not been done in the present case prior to the proceeding to adjust divisions of rates between the complainant and the other parties, and in our opinion the Commission cannot make its order effective from the date of beginning the investigation. For these reasons the preliminary writ should be granted.

BURNS, District Judge, concurs.
WALKER, Circuit Judge, dissents.